**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| LORA L. SPENCE, | : | |
| Plaintiff, | : | Case No. 3:11cv00341 |
| vs. | : | District Judge Thomas M. Rose |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Lora L. Spence filed an application for Disability Insurance Benefits ("DIB") on January 22, 2004, alleging disability beginning October 1, 1999.  (Tr. 61-63). At an administrative hearing held in 2007, Plaintiff amended her alleged disability onset date to September 1, 2003.  (Tr. 399).  After various administrative proceedings, Administrative Law Judge (ALJ) Thomas R. McNichols II denied Plaintiff's application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 14-27).

Plaintiff brought an action in this Court in August 2008, pursuant to 42 U.S.C. § 405(g), for judicial review of the final decision of Defendant Commissioner of Social

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Security denying her application for Social Security benefits.

In September 2009, United States District Judge Walter Herbert Rice remanded this case pursuant to Sentence Four of 42 U.S.C. § 405(g), for further administrative proceedings.

On December 26, 2007, during remand, Plaintiff also protectively filed an application for Supplemental Security Income ("SSI"). (Tr. 454). This application was denied initially and upon reconsideration. ALJ McNichols subsequently issued a decision on July 11, 2011, addressing both the application for DIB and for SSI. (Tr. 439-454). ALJ McNichols' decision was partially favorable, finding Plaintiff disabled as of February 18, 2008. (*Id.*).

Thereafter, Plaintiff filed this action on September 27, 2011, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c), and arguing that she was disabled prior to February 18, 2008.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. # 18), the Commissioner's Memorandum in Opposition (Doc. # 20), Plaintiff's Reply (Doc. # 21), the administrative record, and the record as a whole.

## II.     BACKGROUND

### A.     <u>Procedural History</u>

Spence filed her application for DIB in January 2004, and later amended her alleged disability onset date to September 1, 2003. (Tr. 61-63, 399). After various administrative proceedings, ALJ McNichols denied Plaintiff's application based on his

conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (Tr. 14-27).

Plaintiff brought an action in this Court in August 2008, pursuant to 42 U.S.C. § 405(g), for judicial review of the final decision of Defendant Commissioner of Social Security denying her application for Social Security benefits.

On September 28, 2009, District Judge Rice remanded this case pursuant to Sentence Four of 42 U.S.C. § 405(g), for further administrative proceedings.  *Spence v. Comm'r of Soc. Sec.,* 2009 U.S. Dist. LEXIS 93889, *2 (S.D. Ohio 2009).  District Judge Rice also ordered that on remand the ALJ is "to refer the Plaintiff to a medical professional who specializes in fibromyalgia and, in addition, to receive, by way of report and/or testimony, any medical evidence the Plaintiff wishes to produce, in order to determine whether the Plaintiff was disabled, within the eligible period, on the basis of fibromyalgia, standing alone, or in combination with other conditions."  *Spence*, 2009 U.S. Dist. LEXIS 93889 at *8.

After two additional administrative hearings, ALJ McNichols issued a partially favorable decision finding Spence disabled as of February 18, 2008, rather than as of her claimed onset date of disability, September 1, 2003.  As a result, Spence therefore was granted SSI beginning February 18, 2008, but was not provided DIB because the onset date of disability found by the ALJ occurred after the termination of Spence's insured status on June 30, 2005.

On September 27, 2011, Plaintiff brought this case seeking review of the Social

3

Security Administration's denial of her application for DIB. (Doc. #1). On March 9, 2012, Defendant filed a Motion to Remand pursuant to Sentence Six of 42 U.S.C. § 405(g), informing the Court that "the complete claim file(s) of the Administrative Law Judge's (ALJ) decision dated July 11, 2011 cannot be located." (Doc. #7 at 2).

According to Defendant, "following the issuance of the partially favorable decision, the Title II portion of the paper file was sent to a processing center in Baltimore, Maryland, for implementation," however, "[t]hese records do not reflect the routing of the Title XVI portion of the paper file." (*Id.*). Subsequently, Defendant requested for this Court "to remand this case to an ALJ to offer Plaintiff a *de novo* hearing; to address any additional evidence submitted; to take any further action needed to complete the administrative record; and to issue a new decision." (Doc. #7).

Despite Plaintiff's strong opposition, the Court nonetheless remanded the case on April 25, 2012. At the same time, however, it also set forth specific instructions and deadlines to reconstruct the record on remand, rather than conduct a *de novo* hearing and issue a third decision. *See Doc. # 9*, *PageID#* 81 (citing to Hearings, Appeals and Litigation Law Manual (HALLEX) I-4-3-40). Ultimately, Defendant was able to obtain copies of the missing documents from Plaintiff's counsel and file a certified administrative record on November 19, 2012.

**B.**   **Plaintiff's Testimony**

Plaintiff testified at four hearings before ALJ McNichols. As to the first hearing – held on October 18, 2006 – ALJ McNichols summarized Spence's testimony as follows:

4

<u>Testimony on October 18, 2006</u>

The claimant testified that she was separated from her husband and now lived with her boyfriend and his 17-year old daughter.  The claimant said that she drove just once a week because she was sick a lot.  She indicated that she stopped work as a part-time library employee in May 2004 because she was becoming more ill.  She stated that she began having trouble thinking and getting confused.  She could not handle weight on her left ankle and leg.  She stated she had Crohn's disease, although she was not taking any medication for it then.  She said that the Crohn's disease flared up when she was under stress.  She complained of having extreme fatigue from fibromyalgia.  Her fibromyalgia affected various muscles and caused her to have "fibro fog."  She had difficulty judging distances when walking.  She had arthritis affecting her ankles, knees, hip, hands, and shoulders.  A doctor (Dr. Henderson) informed her that she was in a "pre lupus" stage.  She was on Vicodin, a narcotic, and other medication including anti-inflamatory medication.  Because she was depressed, she had trouble controlling her emotions and tended to cry about everything.  She had crying spells once a month or a lot more than that.  She described having a quick temper and a lot of anxiety.  She said that she had suicidal thoughts.  She had undertaken psychological therapy a couple of times but stopped.  She was going to see a counselor once a month and was going to group therapy once a week.  She had been seeing a psychiatrist every one-to-three months.  She said that some of her medication caused her to feel more fatigued or in need of naps.

The claimant testified further that she had constant arthritic pain that was getting worse.  The pain was constant.  Her hand pain worsened with use.  She was unable to close her fist for very long.  With medication, her pain was 6/10, and it was worse without medication.  Her worst pain was in the back, but she did not know why.  Medications help with some of the pain but not all of it.  She was most comfortable when she was allowed to change positions during the day, but she then said that she was more comfortable if she was lying down flat with her knees up.  She stated that she did not sleep well at night.

The claimant estimated that she could sit one hour, stand 20 minutes, and walk 10 minutes.  If she walked more than 10 minutes, she became cold and had a clammy sweat, as well as back pain and tightness in her chest.  She could not lift more than perhaps five pounds because lifting caused her to have pain in her shoulders.  She stated she would be too confused to do her past work and would be off sick too much.  She added that on some days she vomited due to adhesions in her stomach, and she complained that her medication made her sleepy.  She did the cooking with help from her boyfriend's daughter.  She was unable to wash all the dishes at

5

once.  She did launder the clothes and made the beds.  She went to the grocery, but she said that she had to stop and rest in the middle of her shopping.  She talked to friends on the phone, and her sister visited.  She had been unable to sit at the computer for a year.  She used to practice yoga, but she no longer maintained a regular routine.  Doctors advised her to get out and walk, but she had not felt well enough to do so.  She tried marijuana because she heard it would help pain.  She cut back her smoking to one or two cigarettes a day.  She used a stool in the shower stall.  She was able to dress herself most of the time.  The claimant indicated that she was in and out of bed between 6:30 am and 9:30 am.  She rose again at noon, ran the dishwasher, put in a load of laundry, did more dishes, and put the laundry in the dryer.  She did not watch television during the day.  She did a lot of reading, but she forgot what she read.  After supper she would watch television with her boyfriend's daughter.

In response to an inquiry by her representative, the claimant testified that she was not well enough to leave the house every day and that she sometimes was too sick to drive.  She was able to get out of the house once a week to attend her group therapy.  She said that she was obsessive compulsive, having to wash her hands all the time.  She also obsessed about numbers.  For example, she had to eat four cookies.  Sometimes, her sister had to balance her checkbook.  Her hands cramped after 30 minutes of use.  She took a nap for three hours if she felt tired.  Her boss wrote a letter explaining that she did not fake her symptoms.  She tended to grind her teeth, and she even split her upper lip.  She had severe migraine headaches four times a week.  The migraines lasted up to three days at a time.  She had to put things over her eyes and ears during a headache.  Some sprays helped to stop the headaches, but as soon [as] she got up and moved around the headaches returned.  She had a 30-pound weight loss, but she gained back about 10 pounds.  She was on medication for a thyroid condition.  She had hand tremors, but they were not treated.

(Tr. 16-17).  ALJ McNichols also provided the following summary regarding Plaintiff's testimony at the second hearing:

Claimant's Testimony

At the hearing held on April 24, 2007, the claimant testified that she has had constant daily abdominal pain for about one year.  She attributed her abdominal pain to Crohn's disease.  She suffers from fibromyalgia pain.  She has osteoarthritis in her back and knees.  She has arthritis in her shoulders, hips, and hands.  She has difficulty using her hands to open bottles, but she can still button

and zip her clothes.  She gets cramps on doing repetitive things with her hands like chopping food.  She is depressed, which causes her to be tearful some days and to have crying spells every other week.  Her mood is flat, and she does not experience either anger or joy.  She sees a psychologist once a month, and she goes to a support group every week unless she lacks transportation.  She has had no inpatient mental health care since June 2006.  She has an obsessive compulsive disorder (OCD), but it is doing better with a change of medication in March 2007.  She has a high level of anxiety as well as high levels of paranoia.  She worries about cats and children.

The claimant testified further that she has had constant pain in all of her joints for about two years or longer.  She has constant shoulder pain.  She can raise her arms above shoulder level.  She wears a patch, which helps with her shoulder mobility, but the patch does not help with her abdominal pain.  She has thyroiditis, which is getting worse.  She has carpal tunnel syndrome, which is worse in her left hand.  Her back pain shoots up her legs.

The claimant testified that she can stand 20 minutes and walk 10 minutes.  She can lift five pounds or a carton of milk.  Walking hurts her back and the posterior of her legs.  She has not been able to cook or clean for about three weeks.  She does no grocery shopping.  In a typical day, she does little.  She stays in contact with her sisters by phone.  She talks to her boyfriend's daughter when she gets home from school.  She drives less than once a week and tends to get lost when she does drive.  She does no reading except for some magazines.

In response to an inquiry by her representative, the claimant testified that she has headaches two or three times a week.  Her headaches last for two-to-three hours.  She has had a problem with sleepiness for three years.  She may fall asleep while eating or talking.  She sleeps eight-to-14 hours a day, or she may sleep all day.  She can use her hands to write for 40 minutes.  Her sisters visit her, but she does not go out with them.  She has trouble leaving home because she has a sense of doom.  Once a month, she does not even get out of bed.  She related having problems with her boss at the library where she worked and being intimidated by co-workers.  She missed work for various medical reasons including Crohn's diseases, vomiting, and fibromyalgia.

In response to a re-direct examination by the Administrative Law Judge, the claimant admitted to being charged with the assault of another person in August 2006, concerning a dispute involving her boyfriend.  This assault occurred at another person's home.  The claimant pled guilty to the charge, and sentencing is to take place in May 2007.

7

(Tr. 18).  Plaintiff again testified at a third administrative hearing held on November 17, 2010.  (Tr. 1170-1219).  At this hearing, Plaintiff testified that she is still able to drive, but only does so one to four times a month due to her health.  Specifically, Plaintiff does not drive more often than this due to feeling sick to her stomach and because of her narcolepsy.  (Tr. 1175).  She stated, "I'm not awake enough that I feel that I'm safe to be on the road."  (Tr. 1176).  Plaintiff acknowledged to the ALJ that she was involved in a car accident in 2009, and was not sure if it was caused by her medical problems or medications.  She stated "I was confused by the traffic light."  (*Id.*).

Plaintiff graduated high school, and has never had any vocational training of any kind.  She testified she used to work part-time at a library until her alleged onset date of disability – September 1, 2003.  (Tr. 1177).  Plaintiff stopped working at the library because she was having problems with her health, including confusion, and trouble with her legs giving out on her.  (*Id.*).  Plaintiff testified her fibromyalgia was causing her pain and stiffness in her muscles as a result of sitting during the hearing.  She testified the pain was located in her shoulders, neck, back, and hands.  (Tr. 1178).  Plaintiff testified she takes medication for her fibromyalgia and receives trigger point injections.  (Tr. 1178-79).  She stated she is able to raise her arms above her shoulder, and is able to use her arms, hands, and fingers.  (Tr. 1179).  She also stated she has trouble with arthritis in her back, neck, and hips, and takes Nerontin and Vicodin for the pain.  (Tr. 1179-80).  Plaintiff also suffers from bilateral carpal tunnel, which she stated prohibits her from being able to "do things like wash dishes," although she can button and zip her clothing.

(Tr. 1180).  She stated this "acts up" every few months, at which time she will wear braces on her wrists at night for a few days to help with the pain.

Plaintiff also stated that, in addition to irritable bowel syndrome, "[m]y doctor said my esophagus isn't moving my food and my stomach isn't moving my food and my bile duct isn't, so my food gets stuck and it makes my liver enzymes go up and then that makes me sick and then . . . sometimes I'll throw up and I'll throw up like two days worth of medicine along with food."  (Tr. 1181).  Plaintiff testified her doctor has instructed her to "eat six small meals a day and try to move around."  (Tr. 1182).  She also stated that she just recently had surgery for this issue, and the doctor "opened the bottom of my bile duct . . . so they're hoping that gravity will make my food move through."  (Tr. 1182).

Plaintiff also testified regarding migraines that she continues to experience.  She stated that the headaches "happen in clusters where I'll get them a whole bunch . . . typical month probably seven to nine and they may last one to two days."  (Tr. 1183).  She testified she can take up to two doses of Imitrex every 24 hours to help with the headaches, but it does not always help and sometimes she actually must go visit her doctor for some kind of shot.  (Tr. 1183). Plaintiff also stated that she has sores in her mouth, and on her hands, which a biopsy showed could be lupus, but she thinks might also be some type of allergic reaction.  (Tr. 1183-84).  Plaintiff stated these sores appear approximately every three months, and will take several weeks to completely resolve. (Tr. 1184).  She stated "[m]y sores on my legs have lasted for two years and those are really painful and they'll heal up some and then they'll open back up."  (Tr. 1184).

9

Plaintiff also discussed her narcolepsy.  When asked how it affects her, she stated "It makes me, I'll go to sleep in the middle of conversation or go to sleep when I'm eating."  (Tr. 1184).  She stated this occurs, "[w]hen I take my medicine, about 80 percent of the time I would say it works and then the other 20 percent of the time, storms seem to set some of them off and then I think maybe my stomach problems may keep the medicine from [working]."  (Tr. 1185).

As to psychological or emotional problems, Plaintiff testified she suffers from depression which makes her feel hopeless and unmotivated.  (Tr. 1185).  Plaintiff stated she goes to counseling, and has been going for maybe four or five years.  She stated she sees her psychologist once a month and attends a group on Wednesdays, if her health permits.  (Tr. 1186).  Plaintiff takes anti-depressant medication, which was originally prescribed by her psychiatrist but due to his retirement, is now prescribed by her family doctor.  (*Id.*).  Plaintiff stated her current medications do not cause her any side effects.

Plaintiff also testified that she was admitted to the hospital in October 2010 due to an enlarged bile duct. (Tr. 1188).  As to her pain, Plaintiff stated that most of her pain is located "[i]n my lower back and then on the lower right side of my stomach and then my neck and my shoulders and then the sores I get in my mouth."  (Tr. 1189).  She stated she has been experiencing these pains for "quite some time," and experiences the pain "all the time."  (Tr. 1189).

Plaintiff also described the pain as follows: "The pain in my back is constant, it just varies in how severe it is.  The pain in my stomach I always feel it and it also just

varies in how bad it is.  My mouth, that depends on if I have sores in my mouth which in the past two years has been quite frequent and my neck and shoulders for several years have been very bad."  (Tr. 1189).

Plaintiff testified the pain, if in her shoulders, often causes her headaches. Medication helps enough to prevent her from throwing up from the pain, however, Plaintiff stated "[i]f my pain gets too out of control I often throw up just because the pain is so bad."  (Tr. 1190).

Plaintiff stated that she is most comfortable "partially sitting up with my knees bent with something under my knees."  (Tr. 1190).  She also stated that she sleeps at night, but "sometimes have bouts of hypersomnia where I don't hardly wake up for days." (Tr. 1190).  She stated she will say in bed all that time, and that "my boyfriend will have to wake me up to get me to drink fluids, to get some Ensure in my body so I have some nutrients and then he'll have to yell at me to keep me awake during this time."  (Tr. 1191).

Plaintiff testified that she estimates she could walk a city block at one time, but would need to stop walking further due to pain and muscles spasms in her back.  (Tr. 1191).  Plaintiff stated that "[s]tanding is really hard," and that she can only stand for "probably 15, 20 minutes."  (Tr. 1191).  Plaintiff testified that sitting – as she was at the hearing – is very uncomfortable and that she could only do so for about an hour.  (Tr. 1191).  She testified she can sit longer in a reclined position, however, because there is no pressure on her back in that position.  (Tr. 1191).  Plaintiff stated she can use her arms,

11

hands, and fingers, and can lift only about a gallon of milk (approximately 8 pounds). (Tr. 1192). She stated she can lift a gallon of milk, however, if she had to lift it repetitively it would cause her pain in her back and shoulders. (Tr. 1199). Plaintiff stated she can climb steps. (Tr. 1192). When asked by the ALJ "[w]hat would be the main problem in doing even sit down type work?", Plaintiff replied, "[l]ike right now I'm in so much pain I would be, I don't think I would be able to concentrate to do a good job . . . and like right now I'm getting sick in my stomach." (Tr. 1192).

Plaintiff testified she cooks maybe once or twice a week; does not wash dishes; has occasionally tried to vacuum with a "little Bissell vacuum"; washes clothes "maybe every other week"; does not make beds; goes grocery shopping "with the help of somebody . . . once a month or every other month"; does not go to church; does not visit friends or relatives; does not go to the movies; no longer has any hobbies; does not garden or do yard work; and tries to avoid exposure to sunlight due to skin sensitivity. (Tr. 1194-95). Plaintiff testified she does some very basic home exercises "that keep [her] muscles from completely knotting." (Tr. 1195).

On a typical day, Plaintiff stated that she will wake up about 11:00 a.m., then she will take her medication, which she sets near her bed. (Tr. 1196). She will then lay in her bed for two hours with her cat, while she waits for the medication to work before getting out of bed. (Tr. 1197). After she gets out of bed, she will brush her teeth and take a bath. (Tr. 1197). She stated her skin reacts to the bath water, however, which causes her to need to use ice packs to get her skin to "calm back down." (Tr. 1197). She estimated this

takes another three hours. (*Id.*). Eventually she will go sit in a reclined position and watch television for a while. She eventually will eat dinner once her boyfriend gets home from work. (Tr. 1198).

Plaintiff testified, for a fourth time, at a hearing held on June 1, 2011. (Tr. 1220-1240). Plaintiff stated she still has a driver's license but drives even less now than before (approximately zero to four times a month). (Tr. 1226). Plaintiff indicated her pain has worsened: "I still have the bad pain all the time but now in a lot of ways it's worse because my pills aren't even digesting to where I can count on them . . ." (Tr. 1226). Plaintiff testified that she still experiences problems from her narcolepsy. She stated that "I can go to sleep in less than a minute on my day time sleep studies and sometimes at home I don't even completely realize when I go to sleep." (Tr. 1228-29). Plaintiff stated that she takes Dextroamphetamine four times a day for her narcolepsy, and while sometimes it helps, it causes horrible pain in her stomach. She stated that, due to her stomach problems, "I have the problem keeping food down and then even when it moves through my bowel well starting with my esophagus there were four things wrong with my esophagus and that was one of the things that was making me throw up when I was in my sleep and a couple of weeks ago when I was vomiting I inhaled vomit so I'm suppose to go have a chest x-ray." (Tr. 1230). Plaintiff testified she vomits at least once daily, "but more like it's several times and it's just getting worse and worse." (Tr. 1230). Plaintiff also stated she still is experiencing migraines, and has a "really bad one on average at least twice a month." (Tr. 1234-35).

13

### C.     Medical Expert Testimony

*Herschel Goran, M.D.*

Dr. Goran, a retired neuorologist, testified at the hearing held on November 17, 2010. Dr. Goran reviewed the record, and concluded that Spence has a number of severe impairments, including narcolepsy, major depressive disorder, bilateral carpal tunnel syndrome, various kinds of anxiety disorder and personality disorder. (Tr. 1201). Dr. Goran acknowledged that Spence has fibromyalgia, but concluded "that's not a severe impairment," and advised her that "if she wants to get rid of her fibromyalgia she should be exercising . . ." (Tr. 1201-02). Dr. Goren provided the "most weight" to "everybody." (Tr. 1203). He also opined that "[i]f [Spence] wants to get rid of her narcolepsy and tiredness she should stop taking [specific medications]."

*Mary Buban, Psy.D.*

Dr. Buban, a clinical psychologist, testified at the hearing held on April 24, 2007. Dr. Buban expressed some concern regarding the amount of medications Spence was taking for her numerous impairments. (Tr. 424). Dr. Buban reviewed the record, and opined that Spence's mental impairments did not meet or equal any listing. (Tr. 423).

### D.     Vocational Expert Testimony and Medical Source Opinions

The Court has thoroughly reviewed both volumes of the certified administrative record, including, of course, vocational expert testimony and all medical records. As neither party in this case provided a full discussion of this evidence, and in the interest of brevity, the Court likewise will only address such evidence as necessary in its discussion

14

provided below.

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    Social Security Regulations

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See* Tr. 440-42; *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?

2.     Does the claimant suffer from one or more severe impairments?

3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**C.     ALJ McNichols' Unfavorable Decision dated May 9, 2007**

At Step 1 of the sequential evaluation, ALJ McNichols found that Plaintiff has not engaged in substantial gainful activity since September 1, 2003, the alleged onset date. (Tr. 19).

The ALJ found at Step 2 that Plaintiff has the following severe impairments: 1) a history of fibromyalgia; 2) a diagnosis of bilateral carpal tunnel syndrome; 3) arthritis; 4) a bipolar disorder with depression; and 5) a history of somatization disorder. (*Id.*).

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. (Tr. 20).

At Step 4 the ALJ concluded that Plaintiff retained the residual functional

capacity[2] (RFC) to perform a limited range of light work subject to: 1) frequent (not continuous) fingering; 2) no repetitive use of foot controls; 3) no climbing of ropes, ladders, or scaffolds and no exposure to work place hazards; 4) no work above shoulder level; 5) no exposure to temperature extremes or humidity; 6) low stress jobs with no production quotas and no over-the-shoulder supervision; 7) no requirement to maintain concentration on a single task for longer than 15 minutes at a time; 8) limited contact with co-workers and supervisors; and 9) no direct dealing with the general public.

The ALJ concluded at Step 4 that Plaintiff was unable to perform her past relevant work as a library aide, order clerk, and service representative. (Tr. 25).

At Step 5, based on the vocational expert's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform given her age, education, work experience, and RFC. (Tr. 26-27).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB. (Tr. 27).

### D.    ALJ McNichols' Partially Favorable Decision dated July 11, 2011

At Step 1 of the sequential evaluation, ALJ McNichols found that Plaintiff has not engaged in substantial gainful activity since September 1, 2003, the alleged onset date. (Tr. 442).

---

[2] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

The ALJ found at Step 2 that Plaintiff has the following severe impairments: fibromyalgia, idiopathic hyperinsomnia, bilateral carpal tunnel syndrome, arthritis, history of irritable bowel syndrome (with recent referral for gastritis), a bipolar disorder with depression, and a history of somatization disorder.  (Tr. 442).

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (Tr. 443).

At Step 4 the ALJ concluded that, prior to February 18, 2008, the date the claimant became disabled, she had the residual functional capacity to perform sedentary work, except that she could never perform work above shoulder level, perform repetitive use of foot controls, or climb ladders, ropes, or scaffolds; could perform fingering (fine manipulation) no more than frequently; needed to avoid exposure to hazards, temperature extremes, and humidity; could not be required to maintain concentration on a single task for longer than 15 minutes a time; limited to low stress jobs (defined as no production quotas and no over-the-shoulder supervision) that involved no direct dealing with the general public and only limited contact with coworkers and supervisors.  (Tr. 444).

The ALJ concluded at Step 4 that Plaintiff was unable to perform her past relevant work as a library assistant, reservation agent, support representative, and supervisor. (Tr. 451).

At Step 5, based on the vocational expert's testimony, the ALJ determined that, prior to February 18, 2008, there were jobs that existed in significant numbers in the

national economy that Plaintiff could perform given her age, education, work experience, and RFC. (Tr. 451-52). However, the ALJ concluded that, beginning February 18, 2008, there were no longer any jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 453).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not disabled prior to February 18, 2008, but became disabled on that date and has continued to be disabled through the date of the decision. (Tr. 453).

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Social Security*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*,

486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.   DISCUSSION

Spence assigns the following errors in this case:  (1) the onset date of disability determined by the ALJ is not supported by substantial evidence; (2) the ALJ erred in evaluating her fibromyalgia; (3) the ALJ erred by discounting the October  2004 opinion from her treating physician, Dr. Gebhart; (4) the ALJ erred in the amount of weight assigned to Dr. Goren's testimony; (5) the ALJ's credibility finding was not supported by substantial evidence; (6) the ALJ's hypothetical question did not accurately portray all of her alleged physical and mental impairments.  Defendant contends the ALJ has not erred, the decision is supported by substantial evidence and should be affirmed.

It is undisputed that Spence is disabled.  ALJ McNichols found her to be disabled under § 1614(a)(3)(A) of the Social Security Act beginning on February 18, 2008, and

accordingly, awarded her supplemental security income beginning on that date. The issue, however, is whether the onset date of disability occurred at an earlier time, and prior to the termination of Spence's insured status on June 30, 2005.

In determining February 18, 2008 was the date Spence became disabled, ALJ McNichols relies on the most recent opinion of her treating physician, Dr. Rick Gebhart, D.O., dated February 18, 2008, while giving little weight to the same physician's earlier opinion from October 2004.

In Dr. Gebhart's report dated February 18, 2008, he states that he has been treating Spence since December of 1999, she has a chart that is approximately three inches thick, she has numerous medical problems, and visits the office quite frequently. (Tr. 721). Dr. Gebhart first discussed Spence's psychological problems, including somatization disorder, post traumatic stress disorder, depression, obsessive compulsive disorder, and an anxiety disorder. (Tr. 721). Dr. Gebhart opined that "[a]ll of these numerous psychiatric problems are under extremely poor control and this has kept her out of the workforce . . . [and] [s]he cannot hold a job for her mental problems alone due to her severe depression and anxiety." (Tr. 721).

Dr. Gebhart next discussed Spence's numerous physical problems. (Tr. 722). Dr. Gebhart stated the following regarding these impairments:

> she has many, many physical problems including Crohn's disease which is fairly well controlled at this point. She does have some diarrhea which hits at times. In addition to that, she has irritable bowel syndrome with constipation so her diarrhea and her constipation can alternate making it very difficult for her to know which she is going to have making it very difficult for us to treat. One minute she's

having diarrhea and the next minute she's having constipation and so it makes it very difficult for her to know what's coming next.

In addition, she has fibromyalgia with 14 of 18 tender points on the original diagnosis.  From day-to-day this, of course, changes and sometimes she has a tremendous amount of trigger points which we will inject with Lidocaine and with trigger point injections to try to give her relief.  We'll also talk about medicines at the end that she takes.  Her fibromyalgia is under very poor control.  She's tried Lyrica, the new medicine for fibromyalgia, and it has not been very good for her.

In addition, she has hypothyroidism due to Hashimoto's thyroiditis and, of course, she takes medication for.

She has a history of migraine headaches which are uncontrolled.  These are, of course, driven by the depression, the stress, and, of course, the migraines are also driven by poor sleeping habits which is one of the constitutional symptoms of fibromyalgia where the patients do not sleep well.

In addition, she has narcolepsy which was diagnosed through blood work.  She has classic narcolepsy also.  Patient falls asleep which also makes it difficult for her to work and she has difficulty waking up in the morning due to the fibromyalgia as well as due to the narcolepsy.  Patient also has reflux esophagitis.

(Tr. 722).  Ultimately, Dr. Gebhart provided the following conclusion and reasoning:

In conclusion, Lora Spence has just a multitude, as you can see, of numerous problems.  Many are related on the same gene as is the depression, anxiety, irritable bowel, migraines, and the fibromyalgia; all on the same genetic damage which has been shown in genetic reconstruction.  Due to the fact that patient has these severe problems with very, very poor response to medications, very poor response to therapy, and she has a history of this that goes back nine years, I doubt that she's ever going to improve.  Her continued financial stresses and reliance on others makes these problems even worse.  Ms. Spence will never ever work in any fashion for gainful employment due to the fact that she has numerous medical problems and would never make it to work more than one day a week and no one would hire such a person.

(Tr. 723).  The ALJ provided deferential weight to Dr. Gebhart's February 18, 2008

opinion, and used the date of this report as the onset date of Spence's disability.  Spence

22

argues this date is "arbitrary . . . especially when one notes that this date only coincides with the date of a report," and that "[c]ompleting a report means nothing with regard to the [her] medical condition on that date." (Doc. #18, *PageID#* 159). Defendant argues substantial evidence supports the ALJ's finding that Plaintiff became disabled on February 18, 2008, and such a finding should be upheld. (Doc. #20, *PageID#* 186-87).

Social Security Ruling 83-20 provides, among other things, that for disabilities of nontraumatic origin, "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." Moreover, "the regulation <u>demands</u> that the claimant's claimed onset date be adopted if it is consistent with all the evidence available." *Willbanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 304 (6th Cir. 1988) (emphasis added); *see also SSR 83-20* ("In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. . . . the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.").

In this case, Spence's claimed onset date of disability is September 1, 2003. The ALJ concluded, however, that Spence did not become disabled until February 18, 2008 – the date of Dr. Gebhart's opinion. Prior to February 18, 2008, the ALJ found the medical record lacked objective findings and that Spence was not credible.

For the reasons that follow, the Court finds the ALJ's conclusion that Spence was not disabled until February 18, 2008 is not supported by substantial evidence and

should be reversed.

The ALJ found that Spence has had the following severe impairments since the claimed onset date of disability of September 1, 2003: fibromyalgia, idiopathic hyperinsomnia, bilateral carpal tunnel syndrome, arthritis, history of irritable bowel syndrome (with recent referral for gastritis), a bipolar disorder with depression, and a history of somatization disorder. (Tr. 442).

The ALJ concluded that Spence was not disabled on her claimed onset date of disability of September 1, 2003, because, "[t]he claimant's assertion that she has not been able to work at any time since the alleged disability onset date is not supported by objective medical evidence." (Tr. 445).

The ALJ addressed the medical evidence submitted *prior to his first non-disability decision*, as follows: "[t]he discussion of the medical evidence submitted in connection with the prior decision, which shows rather unremarkable objective findings and a limited treatment history, is incorporated by reference herein (see Exhibit 3A)." (Tr. 445).

As to the medical evidence submitted *after the first decision*, the ALJ concluded it "also does not support the claimant's allegations of disability. Objective findings are minimal, and the claimant has sought only conservative treatment for her symptoms." (Tr. 446).

Not only are these findings by the ALJ unsupported by the record, but ALJ McNichols either overlooked or simply ignored the findings of this Court in the Decision and Entry issued by Judge Rice on September 28, 2009.

24

Social Security ALJs are not free to ignore Judicial Orders:

> In some Social Security cases, district courts will include detailed instructions concerning the scope of the remand and the issues to be addressed. In such cases, "[d]eviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989). *See also Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967) (noting "the general rule that, on the remand of a case after appeal, it is the duty of the lower court, or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions."). These cases stand for the proposition that the administrative law judge may not do anything expressly or impliedly in contradiction to the district court's remand order. These cases do not preclude the ALJ from acting in ways that go beyond, but are not inconsistent with, the district court's opinion . . . .

*Hollins v. Massanari*, 49 Fed. App'x 533, 536 (6th Cir. 2002). Specifically, this Court

made the following findings regarding the first decision issued by ALJ McNichols:

1. **The Administrative Law Judge found that the Plaintiff had, *inter alia*, a history of fibromyalgia, which he classified as a severe impairment. Tr. 19.** This diagnosis had been clearly set forth by Plaintiff's treating physician, Rick Gebhart, D.O., in several communications which found their way into the Record. For example, in a report transcribed February 13, 2004, Dr. Gebhart indicated, *inter alia*, "the patient does not use any ambulatory aides except when she gets severe fibromyalgia, when she then will use a cane at times. The patient has good gross and fine manipulation. Her physical exam demonstrates tender esophagus, normal heart rate and tender points in 12 of the classic 18 tender points of fibromyalgia." (emphasis added). **There is no medical evidence of record which opines that Plaintiff does not have fibromyalgia.**

2. **Nonetheless, Administrative Law Judge Thomas McNichols appears to minimize not only Dr. Gebhart's diagnosis of fibromyalgia, a medical condition that Plaintiff has had since the age of 20, but appears to discount his report in its entirety.** With regard to fibromyalgia, he acknowledges that "[h]er fibromyalgia is chronic and associated with some tender points and generalized tenderness, but otherwise her physical functions appear to be basically intact from an objective standpoint." Indeed, **the Administrative Law Judge appears to miss the fact that fibromyalgia is <u>not</u> a medical condition which is**

**demonstrable by objective findings;** rather, as the Commissioner has opined on numerous occasions, a standard means of determining the existence of fibromyalgia is the presence of certain tender trigger points, of which the Defendant has 12 in number out of the classic 18 such. Indeed, fibromyalgia is the type of medical condition that produces both good days and bad days, with no determinable pattern, something that Dr. Gebhart noted in his reports, as applicable to Plaintiff. **Moreover, many of the medical professionals that examined the Plaintiff noted muscle and joint soreness, symptoms of fibromyalgia.**

. . . .

*Spence v. Comm'r of Soc. Sec.*, 2009 U.S. Dist. LEXIS 93889, *5-*9 (S.D. Ohio, 2009) (emphasis added).

Despite Judge Rice's findings that (1) ALJ McNichols' first decision was not supported by substantial evidence, and (2) the ALJ "appears to miss the fact that fibromyalgia is <u>not</u> a medical condition which is demonstrable by objective findings," ALJ McNichols nonetheless "incorporated by reference" the same unsupported findings from his first decision, and arrived at the same flawed conclusion that the medical evidence lacks objective findings. This constituted "legal error subject to reversal," *Hollins*, 49 Fed. App'x at 536, because it contradicted Judge Rice's remand Order.

In addition, by incorporating his first decision by reference, ALJ McNichols' incorporated his apparent and mistaken belief that the existence of fibromyalgia is shown by objective medical evidence. The United States Court of Appeals for the Sixth Circuit has recognized that fibromyalgia can be a severe impairment, and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients may present no objective signs of the condition. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243

(6th Cir. 2007), citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam). Patients with fibromyalgia can manifest normal muscle strength and neurological reactions, and may have a full range of motion. *Rogers, supra*. The process of diagnosing the condition includes (1) testing of a series of focal points for tenderness, and (2) ruling out other possible conditions through objective medical and clinical trials. *Id.* (citation omitted).[3] Consequently, the ALJ erred in his second decision by focusing on the lack of objective evidence demonstrating fibromyalgia.

Moreover, while the ALJ gave deferential weight to Dr. Gebhart's most recent opinion from February 18, 2008, the ALJ gave little weight to Dr. Gebhart's earlier opinion from October 18, 2004. (Tr. 449). In Dr. Gebhart's October 2004 report, he noted that he has been treating Spence since December 1999, and that she has medical problems including: Type II bipolar disorder, obsessive-compulsive disorder (uncontrolled), anxiety, self-abusive behavior, insomnia, Crohn's disease, hypothyroidism, chronic back pain, and fibromyalgia. (Tr. 224-27). Dr. Gebhart ultimately provided the following conclusion and analysis in 2004:

> Patient does also have fibromyalgia for which she takes Effexor and that causes her an enormous amount of problems.
>
> Because of the patient's mental capacity, she is unable to work. I do know that she is unable to work. I do know that she has tried several times to get jobs and she generally gets fired because of very poor attendance due to her multiple medical problems and also she gets fired because she is unable to handle stressful situations

---

[3] Judge Rice even specifically pointed out the fact that Dr. Gebhart noted Spence's "physical exam demonstrates tender esophagus, normal heart rate and <u>tender points in 12 of the classic 18 tender points of fibromyalgia</u>." (Tr. 226). *See Spence*, 2009 U.S. LEXIS 93889 at *7.

of any kind. The patient breaks down and cries several times throughout the day. The patient has episodes of mania where she talks quickly and customers can't understand her. Patient has severe depression and mood swings which, to this date, just have not been controlled with regular medicines.

Patient has been seen by psychiatrists, in the past, without great luck. I have taken over [prescribing] all of her medicines because I lecture on bipolar and do know a lot about bipolar even as a family physician.

Patient is going to be sent to a research psychiatrist to possibly see if some new research medicines may help her bipolar.

Because of her OCD, fibromyalgia and other conditions, and chronic diarrhea, she would make a poor candidate for any type of work outside the home and I would not recommend that she work outside the home.

(Tr. 225). In rejecting Dr. Gebhart's opinion from October 2004, ALJ McNichols again overlooked or simply ignored the Decision and Entry issued by this Court in 2009. Judge Rice specifically found that the ALJ's decision to provide Dr. Gebhart's 2004 opinion "little weight" was not supported by substantial evidence, yet the ALJ merely provided the following discussion in reaching the same finding that Dr. Gebhart's 2004 opinion should again be entitled to "little weight":

As discussed in the May 2007 decision, family physician Dr. Gebhart opined that the claimant would make a poor candidate for any type of work outside the home, due to obsessive-compulsive disorder, fibromyalgia, and chronic diarrhea (Exhibit 13F). **The undersigned gives little weight to this assessment, for the reasons discussed in the prior unfavorable decision** (see Exhibit 3A, page 15). The medical evidence submitted after May 2007 also does not support Dr. Gebhart's opinion.

(Tr. 449) (emphasis added). This case was previously remanded by this Court with specific findings made by Judge Rice regarding the ALJ's first decision. The ALJ's deliberate "shortcut" of merely citing back to, and incorporating by reference, his first

28

decision – when such a decision was determined by this Court not to be supported by substantial evidence – is incredibly misguided and a hindrance to the just, speedy, and inexpensive determination of this case. The Defendant's attempt at justifying the ALJ's actions by citing to, and quoting from, a Magistrate Judge's Report and Recommendations that was ultimately rejected in its entirety by the District Judge, is likewise unpersuasive.

Next, the ALJ's brief discussion of Dr. Gebhart's 2004 opinion does not contain "good reasons" for discounting this opinion. This conflicts with the Regulations, Rulings, and caselaw. "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *see* 20 C.F.R. §404.1527(d)(2) ("we will always give good reasons ... for the weight we give your treating source's opinion."); Soc. Sec. Ruling 96-6p, 1996 WL 374188 at *5 ("the ... decision must contain specific reasons for the weight given to the treating source's medical opinion....").

Because the ALJ merely referred to the same findings this Court has already concluded were not supported by substantial evidence, the ALJ's finding that Dr. Gebhart's 2004 opinion is entitled to "little weight" is again found not supported by substantial evidence.[4] The ALJ's finding that "[t]he medical evidence submitted after

---

[4] The ALJ also summarily dismissed the opinion of Spence's treating physician as it pertains to her mental impairments, based on the ALJ's belief that, as Spence's primary care doctor and an internist, Dr. Gebhart is therefore "unqualified to offer an opinion on the claimant's level of mental functioning. " (Tr. 450) (emphasis added). Although the Regulations permit consideration of a treating source's "specialization," the lack of specialization in psychiatry does not make Dr. Gebhart "unqualified" to offer

May 2007 also does not support Dr. Gebhart's opinion," is also not supported by substantial evidence, and in fact, is inconsistent with the ALJ's finding that Spence is disabled as of February 18, 2008.

It appears inconsistency, however, runs throughout the ALJ's decision.  In fact, the majority of medical evidence the ALJ relies on in support of finding that Spence did not become disabled prior to February 18, 2008, is actually from *after* that date.  For example, in showing Spence is not disabled *prior* to February 18, 2008, the ALJ relies, in part, on records from Dr. Henderson from May 2, 2008; from Dr. Allapatt from April 2 and June 20, 2009; hospital records from October 18, 2008; notes from Dr. Pougare from July and November 2010; notes from Dr. Valle from February 2009, and December 2010; Focus Care records from May 2008 through August 2008; BDD reviewing psychologist Dr. Terry's opinion from April 2008; Cindy Matyi's opinion from October 2008; and Dr. Stanchina's opinion from October 2008.  The ALJ does discuss some medical evidence *prior* to February 18, 2008, yet such evidence does not relate to Spence's primary complaints of pain from fibromyalgia, but to less severe physical impairments such as osteoarthritis and irritable bowel syndrome.

As to another major problem Spence suffers from – narcolepsy – the ALJ also appeared to pick and choose the evidence from Dr. Valle's reports that tends to minimize the severity of this impairment prior to February 2008, while failing to acknowledge

---

an opinion as to disability based on Spence's mental impairments simply because he is her primary care physician, or an internist.

evidence in the same reports tending to support Spence's claim of disability. This constituted error. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *see also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002). For example, the ALJ reported that Dr. Valle stated in January 2008 that the medication Dexedrine was "helpful" for Spence's narcolepsy, but the ALJ did not also report Dr. Valle stated in the same report that Spence still reports "one day of the week she may 'crash'." (Tr. 701). Likewise, the ALJ reported Dr. Valle stated in February 2009 that Spence's medications Dexedrine and Xyrem work "extremely well" in combination, but he did not also include that Dr. Valle stated in the same report that Spence has been having issues being able to take both medications due to arthritic flare up, and that she has also "recently come off a 3-day 'crash' where she had not done well." (Tr. 949). The ALJ also did not discuss a letter from Dr. Valle to Dr. Gebhart in October 2006, in which Dr. Valle noted that Spence "can dose off when performing normal activities," and has experienced "episodes of weakness with emotion [and] a feeling as if she is paralyzed." (Tr. 713).

Many of the ALJ's other findings are not supported by substantial evidence. For example, when weighing Spence's credibility the ALJ states that she "exhibited no significant signs of pain or distress," at the November 2010 and June 2011 hearing proceedings. (Tr. 448). This is not correct. The ALJ had the following colloquy with Spence at the November 2010 hearing in which she specifically testified that sitting was

causing her stiffness and pain:

> CLMT:     Can [I] put my leg up on this chair and stand up?
>
> ALJ:      You've had some trouble with fibromyalgia, is that correct?
>
> CLMT:     I'm sorry.
>
> ALJ:      You have to sit down.  I want to be able to hear you.
>
> ATTY:     Oh, okay is it okay if she stands?
>
> ALJ:      Well, you can stand if you speak up and I've got a doctor who's got to hear you and I've got to hear you, so if you'll still speak up you can stand.
>
> CLMT:     I'll try sitting down.
>
> ALJ:      Well if you need to stand, you can.  Are you still having trouble with fibromyalgia?
>
> CLMT:     Yes.
>
> ALJ:      What problems is it causing you now?
>
> CLMT:     I have stiff muscles.  I have muscle pain.
>
> ALJ:      Where do you have muscle pain?
>
> CLMT:     A lot of pain in my shoulders, my neck, my back.  I have pain in my hands.
>
> . . .

(Tr. 1177-78).  During the same hearing, Spence again discussed her discomfort from sitting:

> ALJ:      And how about sitting, if you can move in your chair a little bit like you're doing today how long can you sit?

32

> CLMT:     This is very, very uncomfortable.
>
> ALJ:      Well, you said sitting is your most comfortable position, right?[5]
>
> CLMT:     If I'm reclined where I have pressure off my back.

(Tr. 1191).  A thorough review of the voluminous medical evidence, as well as consideration of Spence's consistent complaints of disabling pain and other symptoms over the course of <u>many</u> years and through <u>four</u> administrative hearings, overwhelmingly detracts from the ALJ's finding that Spence did not become disabled until the date of her treating physician's most recent opinion, provided February 18, 2008.  In fact, a thorough reading of Dr. Gebhart's extensive opinion – for which the ALJ provided deferential weight – leaves it abundantly clear that Spence's "numerous problems" did not suddenly prevent her from working as of February 18, 2008.  Dr. Gebhart specifically noted "Lora Spence has just a multitude . . . of numerous problems," that "goes back nine years, I doubt that she's ever going to improve." [6] (Tr. 723).  Common sense likewise dictates that

---

[5] Here, the ALJ incorrectly recalls that sitting was Spence's most comfortable position.  Spence previously testified that her most comfortable position was:

> CLMT:     Reclining, partially sitting up with my knees bent with something under my knees.
>
> ALJ:      Like in a recliner chair?
>
> CLMT:     Yes.

(Tr. 1190).

[6] The ALJ has a much more optimistic view than Spence's treating physician.  He concluded "medical improvement is expected with appropriate treatment.  Consequently, this case should be reviewed within one year from the date of this decision and on no less than a year basis thereafter."  (Tr. 454).

Spence's well-documented severe mental and physical impairments did not suddenly become disabling on the date of Dr. Gebhart's opinion. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989) ("In addition, and somewhat acknowledged by SSR 83-20, there is the common sense notion that appellant did not suddenly find himself, five months after the expiration of his [insured status time period], completely incapacitated by his schizophreniform disorder.")

For these reasons, the Court finds that substantial evidence does not support the ALJ's rejection of Spence's claimed onset date of disability, September 1, 2003. *See Blankenship*, 874 F.2d at 1121 (citing *Willbanks*, 847 F.2d at 303)("Although the Secretary is not required to present evidence that would eliminate a possible onset date [at an earlier time], the Secretary still must establish by substantial evidence that the disability began [on the onset date found]").

Accordingly, for the above reasons, Spence's Statement of Errors is well taken.[7]

## VI.    REVERSAL AND REMAND FOR BENEFITS

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*,

---

[7] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Spence's remaining challenge to the ALJ's decision is unwarranted.

501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effects of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Spence filed for Disability Insurance Benefits in January 2004, more than nine years ago.  Since that time, Spence has attended, and testified at, four administrative hearings before the same ALJ.  After the case was remanded by this Court in September 2009, it took approximately 22 months until the ALJ issued his decision dated July 11, 2011.  Spence thereafter filed this action a few months later, on September 27, 2011.  (Doc. #1).  Due solely to the Commissioner's inability to locate records necessary to certify the administrative record – and the resulting need to remand this matter to allow for time to obtain these missing records – a certified administrative record was not filed in this Court until more than a year later, in November 2012.  Due to this delay, briefing was not completed in this case until March 2013, nearly 17 months after this case was originally filed.

Upon review of the administrative record, the Court has concluded there is not substantial evidence to support the ALJ's rejection of Spence's claimed onset date of disability, September 1, 2003.  The Court has also again concluded that substantial evidence does not support the ALJ's finding that the October 2004 opinion of Spence's treating physician, Dr. Gebhart, is entitled to "little weight."

The Court must now, of course, determine whether all factual issues have been

35

resolved or whether this case needs to be remanded yet again, for a third time.  Having

thoroughly reviewed the evidence, the Court finds all factual issues have been resolved

and Spence's claimed onset date of disability – September 1, 2003 – should be used, as it

is consistent with the bulk of the available evidence, and the evidence of disability

beginning on September 1, 2003, is strong, while contrary evidence weak.

        In reaching this conclusion, the Court has considered the record as a whole,

including Spence's testimony, work history, and medical evidence.  The Court first notes

that Spence's testimony, spanning many years and throughout <u>four</u> administrative

hearings, has been consistent as a whole, as well as consistent with the medical evidence

of record.  Spence has routinely reported the same complications, including, but not

limited to: significant pain, stiffness, and aches in multiple muscles throughout her body;

severe migraine headaches; persistent stomach pain, as well as vomiting and diarrhea;

problems with sleeping and falling asleep without warning while performing activities of

daily living; depression; and anxiety.  *See* Tr. 16-18, 1170-1219.

        Spence's complaints are consistent with the October 2004, as well as February

2008, opinions of her treating physician, Dr. Gebhart, and the medical evidence as a

whole.  Dr. Gebhart has treated Spence since December 1999, and has been instrumental

in coordinating her care with treating specialists.  Dr. Gebhart's knowledge regarding

Spence's physical and mental health is truly extensive, a fact that is well-evidenced in the

detailed opinions from October 2004 and February 2008.  In fact, while each of Dr.

Gebhart's reports – standing alone – are extremely helpful in determining disability, the

reports – when viewed in combination with each other, as well as the other evidence of record – constitute extremely strong evidence of disability.  The reports provide a thorough, longitudinal, overview of Spence's numerous mental and physical health impairments – at two separate intervals, spanning many years – from a physician who has been diligently treating her since December 1999.  (Tr. 721-23, 224-27).  Moreover, these reports represent an honest assessment of Spence's health, supported by the medical evidence as a whole.  These reports, as well as the additional medical evidence submitted upon remand, when viewed in combination with the medical evidence previously contained in the record, constitute strong evidence of disability.

Spence's work history is likewise consistent with her claimed onset date of disability, September 1, 2003; the medical record; and the record as a whole.  Since September 1, 2003, Spence has not engaged in substantial gainful activity.[8]  (Tr. 442). Prior to September 2003, Spence was able to work full-time – albeit with increasing complications – as an assistant librarian.  Yet by September 2003, her troubles ultimately became too much to permit her to continue to work full-time at the library.  This is documented by her former boss, the co-director at the library, Melissa Ewry.  In a letter addressed, "To Whom it May Concern," and dated August 18, 2004, Ms. Ewry provided

---

[8] In determining whether work activity constitutes substantial gainful activity, consideration must be given to the frequency and duration of periods of exacerbation and remission of the disabling impairment.  Work which lasts only a short time and is stopped due to a claimant's impairment constitutes an unsuccessful work attempt rather than substantial gainful activity, and a claimant "should not be penalized because he had the courage and determination to continue working despite his disabling condition."  *Wilcox v. Sullivan*, 917 F.2d 272, 277 (1990).

the following insight into Spence's decline as an employee:

> Lora Spence has been a dedicated employee for a few years.  During that time I have seen a noticeable decline in her ability to perform her duties as a Librarian Assistant.  Her health has been failing during her employment and along with it came many days that she needed to call in sick to work.  When she was at work, she was most of the time either physically ill or was very uncomfortable. . . . Also, her attendance is so horrible that it would be hard for her to be able to maintain any kind of position in the workplace.  For example, during her time of employment she went from working around 30 hrs a week down to 12 hours a week.  Even working 12 hrs a week she was not able to show up at work as scheduled.  She always provided a doctor's excuse for missed work.

(Tr. 120).  Ms. Ewry's letter is consistent with Spence's complaints, the opinions of Dr. Gebhart, and the record as a whole.  The letter further illustrates that Spence does not appear to be the type of person who simply wanted to avoid working.  In fact, despite her declining condition and numerous health issues, Spence still attempted to stay on-board at the library in a part-time position, working 12 hours a week.[9]  Yet, as Ms. Ewry notes, "[e]ven working 12 hrs a week she was not able to show up at work as scheduled," although "[s]he always provided a doctor's excuse for missed work."  (Tr. 120).  Ultimately, due to the difficulties she was experiencing, and despite the library's uncommonly accommodating attitude, Spence resigned from her part-time position in May 2004, due to her mental and physical health issues.  (Tr. 121).

The Court has also fully considered and reviewed the evidence Defendant argues supports a finding Spence did not become disabled until February 18, 2008.  This evidence, however, is weak.

---

[9] Comprised of two six-hour days or three four-hour days per week.  (Tr.  433)

For example, Defendant first appears to rely on the opinion of a reviewing physician, Dr. Gahman.  (Doc. #20, *PageID#* 182, citing Tr. 228).  Dr. Gahman's opinion – for which Defendant appears to believe should be given more weight than the opinions from Spence's long-time treating physician, Dr. Gebhart – is comprised of a mere five sentences.  Dr. Gahman never treated Spence, and, in fact, even misstated facts he relied upon in his opinion.  For example, Dr. Gahman reported in October 2004 that Spence "works part time," however, she actually stopped her attempt at working part-time four months earlier, in May 2004, due to her numerous health issues.   Dr. Gahman also reviewed the record as of October 2004, yet this was nearly three months prior to when the Agency even received (on January 26, 2005) Dr. Gebhart's first detailed opinion.  (Tr. 224, 228).  Thus, Dr. Gahman never even had a chance to consider this helpful evidence.

Defendant additionally appears to rely on the testimony of Dr. Goren, who also only reviewed the medical evidence, and never treated Spence.  Dr. Goren testified at the November 2010 hearing that Spence's fibromyalgia is not even a severe physical impairment, and, in fact, she can get rid of it by exercising.  (Tr. 1201-02).  Although the ALJ noted that he did not agree with Dr. Goren's assessment as to the severity of Spence's fibromyalgia, he nonetheless provided Dr. Goren's opinion some weight, because, in part, "his opinion is supported by the relatively mild objective findings in the record . . ."  (Tr. 448).  This finding, on which the ALJ relies in providing Dr. Goren's assessment some weight, is not supported by substantial evidence.  Again, as previously discussed, fibromyalgia does not present any objective signs nor can it be confirmed by

39

objective testing. *See Rogers*, 486 F.3d at 243. The ALJ cannot rely on the absence of objective findings – for a condition which may not produce objective signs – as justification for providing Dr. Goren's opinion some weight. Moreover, considering Dr. Goren also believed Spence could cure her fibromyalgia by simply exercising – a suggestion that appears from the record and her treating physician's opinions to have no merit – it is surprising the ALJ would give such an opinion any weight at all. Defendant's reliance on Dr. Goren's extreme opinion is therefore unpersuasive.

Defendant further argues that reports from Dr. Allapatt from April and June 2009, support finding that Spence did not become disabled prior to February 18, 2008. (Doc. #20, *PageID#* 183). Not only are these reports, as a whole, consistent with a finding of disability,[10] the reports are from a time period in which Spence has already been found to be disabled. Even assuming such reports somehow did not support a finding of disability in April and June 2009, as Defendant appears to contend, it is unclear what relevance these findings would have in determining whether Spence was disabled prior to February 18, 2008.

Defendant also argues that Spence's reported daily activities were inconsistent with her complaints of disabling symptoms and limitations. (Doc. #20, *PageID#* 183). Defendant notes that Spence can drive, does "yoga-like" exercises, reads novels, and does housework such as washing dishes, laundry, and "straightening the house." (*Id.*). Yet

---

[10] For example, Dr. Allapat noted Spence showed 13/18 fibromyalgia tender points, (Tr. 914), and complained of joint pain, joint stiffness, and joint swelling. (Tr. 912).

Defendant, as well as the ALJ, do not accurately explain these examples.  As a result, Spence's ability to engage in these activities appears greater than actually exists.  For example, Defendant notes that Spence "can drive," but fails to more clearly explain that such ability to "drive" essentially amounts to making a ten-minute drive to the library and back home, two days per week.  (Tr. 205).  Defendant also states that Spence can do "yoga-like" exercises, yet fails to describe what "yoga-like" exercises consist of.  Spence explains the "exercises" she does at home consists of "strech[ing] my neck every day to keep . . . the muscles from completely knotting."  (Tr. 1195).  As to her ability to wash dishes, do laundry, and "straighten the house," Defendant also does not further explain how Spence's ability to perform these tasks is significantly limited by her impairments.  For example, she is "unable to wash all the dishes at once," (Tr. 17), and "sometimes tries to vacuum, but she cannot complete the task."  (Tr. 205).  Defendant also relies on the fact it was reported that Spence can "read novels," yet fails to acknowledge that she specifically testified "she forgot what she read." (Tr. 17).  Moreover, while Spence may be able to "do" these activities, the record does not suggest she can perform such activities on a sustained basis.  *See Gayheart*, 710 F.3d 365 at 377 ("But the ALJ does not contend, and the record does not suggest, that Gayheart could do any of these activities on a *sustained basis . . .*")(emphasis in original); *see also* SSR 96-8P (explaining that RFC is the most that an individual can do on a regular and continuing basis, meaning "8 hours a day, for 5 days a week, or an equivalent work schedule.").

    After thoroughly reviewing both volumes of the administrative record, as well as

41

providing careful consideration to Defendant's contentions, the Court finds the evidence establishing Spence's disability as of September 1, 2003, is strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. In light of such strong evidence, including the October 2004 and February 2008 opinions from Spence's treating physician Dr. Gebhart, as well as additional evidence submitted after remand, and noting the repeated absence of a proper analysis by the ALJ on two occasions, an Order remanding this case for benefits beginning on Spence's claimed onset date of disability, September 1, 2003, is warranted.

## IT IS THEREFORE RECOMMENDED THAT:

1.      Plaintiff's Motion for Leave to File Excess Pages (Doc. #22) be granted;

2.      The Commissioner's final partial non-disability decision be reversed;

3.      Plaintiff Lora Spence's case be REMANDED to the Social Security Administration for payment of Disability Insurance Benefits based on her claimed disability onset date of September 1, 2003, consistent with the Social Security Act;

4.      Plaintiff Lora Spence's case be REMANDED to the Social Security Administration for payment of Supplemental Security Income based on her application protectively filed on December 26, 2007, consistent with the Social Security Act; and,

5.      This case be terminated on the docket of this Court.


October 2, 2013

                              s/Sharon L. Ovington
                              Sharon L. Ovington
                              Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).